We'll take the last case for this morning and that's United States v. Tyson We will take it under advisement, it's a very interesting case, thank you Ms. Leonard and Ms. Stetson Very well argued on both sides. This is the first case today that has two males. I'm sure you'll be just as good as the women who preceded you. Mr. Barbieri Good morning your honors. Francis C. Barbieri Jr. for the government and with the court's leave I'd like to reserve three minutes for rebuttal. Thank you. The government believes that the district court erred in its conclusion that Sgt. Kalin lacked reasonable suspicion to justify the brief detention of the defendant. The district court failed to properly weigh the totality of the circumstances and to accord Sgt. Kalin's judgment the deference an officer's knowledge and experience deserves. Sgt. Kalin at 3.15 a.m. in the center part of the city of Reading heard 20 to 30 shots. It was later determined that there were 28 cartridges recovered in the area. This was a high crime area. The sergeant was there because there was a private club that emptied out at 3 o'clock in the morning and there were often fights and shots fired. So that's why he was in the area. Within one minute of hearing this fusillage of shots came upon the defendant and three other males. He was in his car, right? The defendant was in a car, yes. The sergeant was in a car, he had the window open, he heard the shots, he immediately drove in the direction. And he saw three people, we read the record, he saw a man. He encountered two groups of civilians. Well one was not a group, one was a man. Yes. One was a man with his bedroom slip. Yes, yes. We do read the record. Great, I'm confident you do. The government's point is that the officer, based on the information he had from his own senses, knew that a crime had been committed and knew generally where that crime had been committed. And he came upon the defendant and three others in that area. That gave the DEL, sergeant, reasonable suspicion to stop and question those males. However, he had more. He encountered this first individual. Wait a second, let me go back a second. Just knowing that a crime has been committed and knowing the area where the crime was committed gives an officer reasonable suspicion that particular individuals committed that crime? I think that's what you said. Yes. It gives him reasonable suspicion, sufficient to detain those individuals and to conduct an investigation of them. If they are temporarily, and this is within a minute of the shots being fired. Are we at the Terry stop stage then? Yes. At this point? Yes. Yes. The district court held that the defendant and the others were detained at the point the officer approached them with his gun drawn. You know, I looked at three opinions and maybe you can distinguish these cases. In Valentine, the officer noticed that one of the individuals on the street moved towards the officer. In Brown, the individual ran away from the police. In Johnson, the officers observed an individual shoving down, making a shoving down motion. Apparently hiding something. But in each of those cases, the individuals or the suspect did something that gave the officers, according to the court, reasonable suspicion. But you have a much lower threshold in these cases. Maybe you can explain how just knowing that a crime was committed and that there are certain individuals in an area amounts to reasonable suspicion. Well, because the area, first of all, it's a very small area. And the officer arrives there almost immediately after hearing the shots fired. All right. You're adding a little bit more now, which is the proximity and the fact that there's nobody else there. Yes. Yes. I think those are very important factors that were present in this case. Certainly the officer, the officer sergeant testified that he did not even know the defendant was in the car when he first arrived at the scene. Additionally, the sergeant's suspicion was further heightened by the conduct of one of the four individuals, the two people he could originally see. The conduct of that individual. When the officer pulled up and said, let me see your hands, this individual ignored the sergeant and proceeded to light a cigarette. So? Why is that suspicious? Well, the sergeant interpreted that based on his experience as this individual represents a threat because he is ignoring the sergeant's instructions. This is a very vulnerable situation. There's exigent circumstances here because of the necessity of determining where these shots have come from. Because he didn't put his hands up and he lit a cigarette? I just talked about this is the United States. People can ignore, I guess, police, can't they? Or do you have an obligation? They can ignore police, but by ignoring the police, that gives the sergeant additional reasons to believe that something's not right here. Okay. So it gives him the right to risk the two guys who were standing when they finally put their hands on the car. Yes. What the sergeant did was to approach that individual that had ignored his command and basically place him in custody. When he did that, he pushed him down onto the hood of his car. He looked to his right and discovered that the defendant and another individual were in the car that he put this individual down on. At that point, he was now confronted with a situation where he has individuals who are in an automobile. And the courts have recognized that that is an inherently dangerous situation. Well, by then, though, he had already called in the incident. He had, but additional officers had not yet arrived. It was shortly after. Didn't Dinger arrive? Dinger, yes. Officer Dinger did arrive, but he arrived after the sergeant had already gotten out of his car and had placed the man who lit the cigarette on the hood of the car and after he discovered the defendant and his passenger. And it was at that point the district court found that the defendant had been seized impromptu. So what happened there? Well, the defendant is in the car. He's not one of these two individuals who are standing up. That is correct. He is the driver of the car. The other guy in the car said, what are you doing? I don't, you know, you don't have a right, blah, blah. Yes, that was the passenger. Yes. Yes. So the seizure occurred at that very point when he has this individual pinned up against the car. Yes. And he looks inside and there's somebody sitting in the vehicle. Yes, and he tells those individuals to put their hands on the dashboard. And that's the seizure, according to the district court. According to the district court, yes. The seizure is while they were in the car with their hands up. Yes, yes. Didn't he make them get out? Eventually they did, yes. And then they conducted an investigation, determined, evaluated whether or not they were wanted. Yes, and then it says they cleared them. Now, what does it mean when the district court says they were cleared? What does the cleared mean? Well, they were checked for whether or not they were wanted and there were any warrants or anything. And they checked with the police radio, and the police radio said there were no warrants. So they were cleared. They were cleared. Was that the end of the terror? When does the right under the terrorist stop end? Well, after the police are confident that they can allow these individuals to safely get back in the car. Under Michigan v. Long, the Supreme Court held that it was not improper to search the interior of the passenger compartment of a car before allowing someone to get into it. That was the passenger, but the passenger is not the issue. Well, they did both. They searched the compartment around the passenger seat and cleared that, and the passenger actually got into the car. They then did the same thing before the defendant got into the car and found under the driver's seat this semi-automatic handgun with a large-capacity magazine. It's always just sticking out. I haven't seen it. There's always something that lets the police go further, right? Always. Well, we don't know the cases where they don't see the guns, so those cases never come to court. But I think under Michigan v. Long, they could have looked under the seat. In this case, it just wasn't necessary. No, no, go ahead. Does this have to be analyzed from the very beginning? That is, did McHale and Saw approach the scene and whether he had reasonable suspicion, or are we looking at two separate events? You seem to be describing the second event involving Tyson as a search in a vehicle for the officer's, I guess, safety versus whether there was reasonable suspicion for the initial terrorist stop. Are they linked, or do we analyze these separately? No, the district court, as I understand it, did not find that there was anything improper in the search of the car and the discovery of the gun. Let's assume the first step was not based on reasonable suspicion. Well, then you don't get to the inside of the car. Did the district court hold that the terrorist stop was unauthorized? Yes, yes, and that's what the government is calling it. Unauthorized. Yes, the district court held that Sergeant Kalin did not have sufficient or reasonable suspicion to justify the stop of the defense. Is it clear that all four, particularly Tyson, were cleared to return to the car when the, assume now that it was an authorized terrorist stop, not understanding what the district court found, you say. And then, I just don't understand what happens. And they call up and they find there's no outstanding warrants for these guys. So, they're allowed to return to the car? Yes. So, was Tyson allowed to return to the car? Well, they had decided it was okay to let him return to the car, but before he did, they wanted to check the car to make sure there were no weapons in the car. And in doing so, that's when they found the gun. And you base that on Michigan v. Long? Yes. On the right to search, to flashlight the car, even after they were cleared? Yes. Or is it contemporaneous with clearing? Well, I'm not sure it matters. Well, it matters. I mean, the case may depend on that. Well, I think the law is that if you have reasonable suspicion to justify a terrorist stop of individuals in a car, at some point during that terrorist stop, you are permitted, the police are permitted, to search the interior of the vehicle. In almost every case that's cited by the defense, the suspect is something else. I mean, in all of the cases, most of all the cases, there were the common circumstances of information about a crime in a high crime area involving shootings and stabbings in the middle of the night, not too many other people around. But you always had something a little bit beyond that. What you've got here is somebody lighting a cigarette. And the officer is saying, show your hands, which apparently he's doing, lighting the cigarette. So, can you? Put your hands up. Yeah. Could you give me something beyond what I've just mentioned that would give the officer reasonable suspicion? Yeah, I would refer the court to the United States versus Goodrich decision of this circuit. Well, that lays out all the factors I've just mentioned. Why? Here, only car in the area of the, well, the only people, let's say, because it's 3 o'clock in the morning. Yeah. Then you have the prior crimes in the area, the stop was close to the scene of the crime, the absence of other individuals, and the time of death. I think you have all those factors in this case. Well, but in all of these cases that we look at, there's always something else, like somebody charging the police, somebody running away from the police, somebody shoving something down under the seat of a car. There's always something that raises the officer's suspicion beyond these garden variety factors. Well, I think as Goodrich held those garden variety factors were sufficient in that case, I think they're sufficient in this case. Is that all you had in Goodrich, all of just those factors? Well, there was a report of a recent crime having been committed. This vehicle was the vehicle found in that area. And, yeah, it was just a car driving away from that area, which is really not much different than what we have in this case. I'm not saying you don't have enough, but I am saying that all these other cases seem to have a little bit more to alert the officer to suspicious circumstances. I think if, except for this individual lighting the cigarette, what would have happened was the officer would have gone up and then questioned these individuals, and perhaps that would have raised some suspicion. But we just don't have that specific factor in this case. Do the police have the right to just stop people? Suppose there had been no shots fired, and it was 3 in the morning, and there were four guys. What are they doing there, 3 in the morning? Do the police have the right to say, what are you doing here? Well, they have a right to say, what are you doing here? But they don't have the right to stop them or to— Detain them? Detain them. Ask them to put their hands up and frisk them? No, not without the— So it's only the fact that there were shots fired in that general vicinity, although we don't know what the vicinity was, because the people who told them where the shots came from gave two different directions. It was like this way. No, I don't think that's true. They both pointed north on Rose Street from Elm, and they both pointed in the same direction. And the only people in the area where these two groups of people, the three individuals pointed, was the defendant and his three associates. The casings were found after all this. When were the casings found? After the police had cleared the scene, and they sent an officer back, and he found those casings at the intersection of Rose and Elm Street. How far were they from where the group of four was detained? A half a block. Is that what happens when you shoot, that the casings go a half a block? I don't know anything about that. They are ejected some distance. Of course, it's quite possible that they were fired a half a block, and then they just walked back to the car. They were found close to where the first man indicated down there. Yes, he was just west of the intersection of Elm and Rose Street. I guess there were four males. Were the four males the only individuals in that area where Officer Kaelin went to, where he was directed? Yes, except for the people that were directing him. Well, except for them. When Kaelin arrived there, this is all he saw, two males standing between three cars. There's something about reading the briefs in this case that really disturbs me. It doesn't matter, but they keep saying that the two men who were walking were Hispanics. What difference does it make if they were Hispanics or black or Caucasian? Both briefs say they were Hispanics, and I don't understand why that wasn't true. That's what the sergeant testified to. It has no significance. I didn't think it had any bearing. No.  Yes. Okay. Thank you. I was just bothered by it. Let me ask you, just to clarify the record, please. The sergeant Kaelin called, I don't know if it was called backup, but there was another officer who arrived at the scene. Officer Dinger. Which one of those officers? Dinger. It was the first one? Yeah. It was the second officer. Officer Dinger. Dinger. Who instructed Tyson and the passenger to get out of their vehicle? Officer Dinger instructed the passenger to get out. Yes. And I believe the sergeant instructed the defendant to get out. Thank you. Oh, yeah. Sorry. Good morning. My name is Bill Honig, and I represent Joel Tyson in this matter. I think the panel has certainly, as Judge Slover indicated, read the record. And clearly, Terry stops are very factually determined. All the opinions seem to say it's a fluid concept. But, Judge Fuentes, I agree with you. There always has been something more than mere presence in the area. Illinois v. Wardlow said it's required. Your Honor's decision in Brown found that the headlong flight apparently was the primary factor in deciding that a Terry stop was appropriate in Brown. I would ask that what the decision would have been in Brown if Brown ran away, and the other two men who remained for the second stop were searched, and a gun was found on them. Because what we have here, there's nothing in the record that indicates any of these four men, other than Caceres and Tyson, who were in the car, were related in any way. There were three cars there, right in the parking lot. One man was between two cars, between, I believe it was a silver car and a red car. Wait a minute. What parking lot? This is... I don't know this. What happens is... Are you talking about Brown, or are you talking about... No, in Tyson. What happens is... The car was in the parking lot? Yes. Oh, okay. What happens is Sergeant Kalin hears gunfire that he believes came from Elm Street. He goes to Elm Street, and according to his testimony, sees several individuals. Not just one, but on Elm Street, sees several individuals. One man, who he described as a Hispanic male, and the reason why it may become of importance to me, is once he describes him as Hispanic, I ask, did you talk to him in Spanish? Did he speak English? The answer was, in that regard, to that man, he said, down there, down there, and pointed. He was west of the intersection of Elm and Road. The shots were right east. Didn't he come out of his house? No, he was already in the street when the sergeant got there. The sergeant assumed he was there. I've assumed this all happened on a street, and there were houses on either side, and my understanding is wrong. Well, if I can go further, maybe we can get there. Yeah. So he goes back to Rose, the intersection of Rose, and starts heading up Rose Street. Now, the man just pointed down there, down there. Really didn't say Rose Street, didn't say the parking lot up Rose Street. He turns on to Rose Street and sees these two men who he describes as Hispanic, and he calls to them, where were the shots fired? Now, actually, the shots were fired in front of them. One of them just goes, and there is no verbal response, so I ask, did you ever ask if they spoke English? Did you ask their name? Did you ask anything else? And the answer was, I asked nothing else. No, I was just thinking of what you started out by saying. This is a fluid situation, and in such a circumstance, there's an officer that knows 20 or 30 shots have been fired. He's probably very tense, and he's trying to get to that location quickly, very, very fast. So when somebody points over there, you really don't have, it seems to me, in this fluid situation, time to go ahead and start investigating. He's just trying to get, somebody may be hit by a shot. Somebody may be dying. So he's trying to get there as quickly as possible. Well, the shots had been over about two minutes, according to the judge's statement. Even then, I mean, he's just trying to get there. So when people are pointing in that direction, that's what Sergeant Cameron's doing. Well, it's a general direction was my point. Not that he was, no one pointed to the parking lot and said those three cars. The answer was? But the two men whom you keep raising in your brief were walking calmly with their arms down, and I guess he was an experienced officer, and he had no reason to think that these two men had anything to do. They were just walking. Well, the guys in, they go, he goes further up the street to where the cars are parked in an off-street parking lot. There are three cars that he described, a silver car, a red car, and the green car that Tyson was in. Two men who, to this day, at least in court, have never been named, were standing outside the car. The officer shouts, show me your hands. There was a black man, he describes. Nothing is said what he did, whether he responded or not. What it said was this other Hispanic, that the officer described as a Hispanic male, was just lighting a cigarette. And Judge Gardner specifically questioned the U.S. attorney. Well, but he saw his hands. His hands were in plain view. He saw his hands, and that was admitted that he did see his hands. That aside, he goes up to the officer. He goes up to him, puts him face down at gunpoint on the hood, and then he sees Tyson and Caceres in the car. He then seizes Tyson by putting the gun to the car, put your hands on the dash. Tyson didn't do anything. He put his hands on the dash. He was sitting there, he was acting casual, as in Roberson. Acting casual is not nervous behavior, it's not headlong flight. He was doing nothing. I'm not sure that you should be able to attribute what this other man did to Tyson. In fact, those guys, as soon as they ran the guy's name. I mean the cigarette, the cigarette lighter. Right. As soon as they ran his name, they let him go. He was gone from the area. And the record is unclear, and it's not in the record, and it is the government's burden to put it in the record, whether they left in the other two cars. It just says those two men left the area once they were cleared. And, Your Honor, the record is clear that Tyson was unhandcuffed and told he was free to go before Officer Dinger went in the car. You don't dispute that it was, or maybe you do, that it was reasonable for the officers to ask the two in the car to step out of the car. They didn't ask them to step out of the car. They took them out of the car at gunpoint, and I think that's a difference. Well, all right, do your version. They were ordered to get out of the car under point of a gun. And that makes it a Terry stop rather than a mere encounter. If they had just said, would you mind answering a few questions, and things develop, you know, the government may be right. I may be separating this a little bit too much, but when the officers are dealing with Figueroa or Figueroa, Caceres was in the car with Tyson. When he's dealing with the individual outside the car, should, for the officer's protection, don't they need to get people out of the car so he can see them better? If the stop was proper. Okay, the initial stop. If the stop was proper, then they have a right to order them out of the car. And what flowed from that circumstance was okay. In other words, if the stop was proper, to order them out of the car would have been okay. Okay, and then checking the car to make sure there are no weapons when they go back in the car, that was okay. I'm not sure. I would go along with the argument, although it certainly doesn't think it's my strongest argument, that Terry is a limited exception from the warrant requirement. It is narrowly drawn and intentionally so. Once they made the decision to do whatever investigation they want, and clearly they didn't question Tyson about anything other than, why are you driving the car? He said, my sister was too drunk. They all provided ID. I understand all of that. The Terry stop was over. That's the question. Isn't that the question? No, I think the question is, without interruption, sorry for interrupting, but they had no reasonable suspicion from the beginning. Yeah, but I was going to ask you, can the district court be sustained if the Terry stop was legal, but there was no basis to further search the automobile by flashing? Yes, I believe they can. And Michigan v. Long, which the government relies on, doesn't say that, you don't read it as saying that, if you're going to let people go back in the car, you as a police person, as an officer, have the right to be sure that they're not going to turn around and shoot you the minute you turn your back. Well, Michigan v. Long I don't think went that far. Michigan v. Long was a lawful traffic stop. There was an accident. Long was acting intoxicated or under the influence of something. He was outside being questioned, and he was trying on his own to get back into the car, and that's the time they looked in the car. I don't see the distinction. I mean, my hypothetical is assuming the Terry stop was legal. Yes. I mean, you think it wasn't. But if it were legal, then doesn't Michigan v. Long give the police the right to assure themselves that letting people leave in a vehicle that can get off quickly, shoot them and run down the street, doesn't they have that kind of protection? Isn't that what Michigan v. Long holds? I think Michigan v. Long left that question open because it wasn't particular to that case because in Michigan v. Long, Long was trying to get back in the car. If I can finish, what I'm saying is that a Terry stop is a finite stop. Had they done that as part of their investigation, I think you're correct, they would have had the right to search the car. But once the Terry stop is over, and at some point it was over, it was over when they unhandcuffed him and told him he was free to go. But then you get to Judge Slover's point, when you let them go, don't you have to look in the car so that you can assure yourself as a police officer, isn't it reasonable to make sure that there aren't weapons in that car? Well, first of all, there wasn't Sergeant Kalin who originated the stop that did that. Officer Dinger really did that because Caceres just wanted to sit there because he was cold. I'm not sure it matters which one. Whoever, I mean what he says he did is he pointed a flashlight in the car, the windows were open. No, he broke the plane. He went in the car. He stuck his head in the car. First he checked the passengers, no guns. Then he checked the driver's side and that's where he saw the gun under the seat. He let him back in the car. Caceres was actually in the car already. But the point is... But Tyson wasn't. Tyson wasn't because Tyson was with another officer. Yeah. I'm just wondering why, isn't it reasonable if I were a police officer in these circumstances, 3 o'clock in the morning, nobody else around, and this is a high crime area, a high crime area, isn't it reasonable for a police officer to check the car before you let people back in to make sure there isn't a weapon there? Again, you're asking the question. I think the argument is certainly they have no reasonable suspicion. That is a, in my mind, it's an open issue what you're asking because they themselves determined that the Terry stop was over. You have to remember, two of the men, the man that he said was the biggest threat, they already let go. Does the reason that the Terry stop is over mean that I cannot inspect the vehicle? I think if the Terry stop is over, that's what gives you the authority to search the vehicle. If you decide it's over. If you decide that it's not over until Tyson leaves the area and they search the car, yes, they had a right to search the car. But if you decide the Terry stop was over when they're unhandcuffed, because if you really, we go back to what I cited in my brief was a case from the Commonwealth Supreme Court of Pennsylvania which officer danger has to be something specific other than I was afraid of everybody in the area. If you hear shots, you're afraid of going into that area as a police officer and rightfully so. That doesn't mean you can search every car and every person in that area. Once they made the decision that these men were no longer the threat they believed and decided to let them go, in my mind, that ends the Terry stop. If that didn't end the Terry stop and it's not ended until they actually leave, then they have an absolute right under Michigan v. Law to go into the car. But they made the decisions in this case, not Tyson. They made the decision, we have no more questions to ask, no more investigation to conduct. You're no longer a person of interest to us. But one could argue, and I think we're going to hear the argument in a minute, that the Terry stop, even though they took the handcuffs off, continued until they were sure that there was no longer any danger, i.e. that there were no charges. Well, if he just said, you know, lock the car, I'm walking home, would they have been able to go in the car? Well, Terry seems to let you have, let the police search an area which is accessible to the defendant or to the perpetrator to harm. But isn't the gun under the driver's cushion seat available? You just have to take it out? When they let him go, when they unhandcuffed him and told him he was free to go, when they made that decision, up to that point, he had no access to the car. Had they searched it before? Absolutely, they had a right to do it. But you're asking the specific question. So you mean the police should keep them in handcuffs until they have searched the car? If they should keep them... Is that the rule that you want us to... No, that's not the rule I want you... The rule I want you is that they had no cause to do it in the first place. It was all they found were people in a high-crime area where shots had been fired. And the area was... These weren't the only people in the area. The club had just closed. It was very busy that night. The officer testified... How far was the club from... Do we know how far the club was from the car? The club was... I think the officer testified two blocks. Because he was... He was parked in front of the club watching everyone leave because it was a hot area. And as Judge Gardner found as a fact, two minutes is enough time for a car to have left the area. Judge Gardner made that finding. And I think that finding is not clearly erroneous. Thank you. It's an interesting thing. It pushes the law. They're trying to push the law. Well... We're going to have to decide... I'm not used to being a police, so... Yes. I know. I just commented on that. We don't get that many orders suppressing. From Judge Gardner especially. Yeah, I don't know. Okay. Just briefly, Your Honors. I know I've already used up more than mine a lot of time. No. Didn't you have... You didn't. Yes, but I went over in mine. Yeah, but that's the Supreme Court. That's that. We don't. Thank you. I just wanted to mention a couple things. It's actually less than two blocks. Officer Dinger said that he was parked in sort of the middle of Third Street. He goes three-quarters of a block to Elm, turns right, and... Rose Street intersects that block of Elm Street between Third and Fourth. So it's... And then the defendants are half a block up. Mr. Barbieri, nobody seems to have... Unless there was evidence that I didn't look at. These men... Nobody suggests that these men were panting that they had just arrived there. Was there any indication that they hadn't been static there for the last two minutes? In other words, if you're coming out... If you've just shot 28 bullets, or whatever they are, wouldn't there be something about you that would show that you had... It turned out, ultimately, that they did, but that's not the point. Wouldn't you ordinarily know that... I mean, did they look to see if they had, what you see on TV, gunshots, gunpowder on their hands? That's a very scientific measurement, and you have to perform scientific tests on people's hands. You don't smell it? No, I don't believe so. But I think what the court has to look at is the totality of the circumstances. And certainly there wasn't anything that Tyson did himself to attract the officer's attention. But you have to look at all the... Well, that's the problem. That's what Judge Wentworth has been asking. Right, but that's why the courts have said you have to look at the totality of the circumstances. And in other cases, where there were not some of the factors present here, you had maybe specific activity by an individual. But if we were to uphold Judge Garner, does that mean that the weapon has to be suppressed? Yes. Yes, that's right. There's no... You don't separate the Terry stop from the officer's concern for safety and welfare? Well, Judge Garner didn't. The district court ruled that the firearm has to be suppressed. And so if that decision is affirmed, then the firearm is suppressed. And you got him on being a felon in possession. Is that right? That's the charge, yes, Your Honor. So if there are no further questions, thank you very much. Thank you. I'm very surprised that Mr. Sassen is not here looking at what you're doing. He's busy. He's busy this week. Oh, because he always comes. On trial, as you may have heard. Oh, I see.